# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| JHOANY ADAME, JUSTIN RIVERA, individually and on behalf of all others similarly situated,<br><br>     Plaintiffs,<br><br> v.<br><br>THE INSTITUTE OF CULINARY EDUCATION, INC.,<br><br>     Defendant. | Civil Action No. <u>1:25-cv-08479</u><br><br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiffs Jhoany Adame and Justin Rivera (together "Plaintiffs") brings this Class Action Complaint on behalf of themselves, and all others similarly situated, against Defendant The Institute of Culinary Education, Inc. ("ICE" or "Defendant"), alleging as follows based upon information and belief and investigation of counsel, except as to the allegations specifically pertaining to them, which are based on their personal knowledge:

## NATURE OF THE CASE

1. Plaintiffs brings this class action against ICE for its failure to properly secure and safeguard Plaintiffs and other similarly situated current and former students' or employees' ("Class Members") sensitive information, including name, Social Security number ("SSN"), date of birth, driver's license number, and U.S. alien registration ("PII" or "Private Information").[1]

---

[1] *See,* The Institute of Culinary Education Provides Notice of Data Event ("Notice") https://www.ice.edu/sites/default/files/PDF/ICE%20-%20Website%20Notice%20-%20Sept%202025.pdf (last visited October 14, 2025).

2.      The Institute of Culinary Education is a private for-profit culinary school with locations in New York City and Los Angeles, offering career training, diploma and associate degree programs in the culinary arts both in person and online

3.      Plaintiffs and Class Members are individuals who were required to indirectly and/or directly provide Defendant with their Private Information. Because of this, ICE has a duty to secure, maintain, protect, and safeguard the Private Information that it collects and stores against unauthorized access and disclosure through reasonable and adequate data security measures.

4.      Despite ICE's duty to safeguard the Private Information of its current and previous students and employees, Plaintiffs' and Class Members' Private Information was compromised in a data breach when, on or about April 21, 2025, a cybersecurity incident involving unauthorized access to certain of their IT systems obtained certain personal information (the "Data Breach").[2]

5.      The data breach occurred in part because ICE stored Plaintiffs' and Class Members' Private Information in an unencrypted, Internet-accessible environment.

6.      ICE claims to have discovered the Data Breach on August 26, 2025.[3]

7.      ICE launched an investigation and "determined that an unauthorized actor gained access to certain Institute systems and copied files." [4]

8.      Despite learning about the breach on or about August 26, 2025, ICE waited at least a month to begin notifying impacted individuals of the unauthorized access. ICE sent letters of notification between September 26, 2025 and October 6, 2025.[5]

---

[2] *Data Breach Notifications*, Office of the Maine Attorney General, https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/19ae3183-eb7f-4985-a5f5-34871731c980.html (last visited October 14, 2025).
[3] *Id.*
[4] *See*, the Notice.
[5] *Data Breach Notifications*, n. 2.

9.      Based on publicly available information, the Private Information impacted by the Data Breach includes a wide swath of highly sensitive information belonging to ICE's current and former students, including their names, addresses, birth dates, Social Security numbers, and driver's license number.[6]

10.     As a direct and proximate result of Defendant's failure to implement and follow basic security procedures, Plaintiffs' and Class Members' Private Information is now exposed to cybercriminals.

11.     Plaintiffs and Class Members are now at a significantly increased and certainly impending risk of fraud, identity theft, intrusion of their health privacy, and similar forms of criminal mischief, risk which may last for the rest of their lives. Consequently, Plaintiffs and Class Members must devote substantially more time, money, and energy to protect themselves, to the extent possible, from these crimes.

12.     Plaintiffs, on behalf of themselves and all others similarly situated, allege claims for negligence, breach of implied contract, unjust enrichment and declaratory judgment arising from the Data Breach. Plaintiffs seek damages and injunctive relief, including the adoption reasonably sufficient practices to safeguard the Private Information in Defendant's custody to prevent incidents like the Data Breach from reoccurring in the future, and for Defendant to provide identity theft protective services to Plaintiffs and Class Members for their lifetimes.

## **PARTIES**

13.     Plaintiff Jhoany Adame is an adult, who at all relevant times, was a resident and citizen of the Commonwealth of Pennsylvania. Plaintiff received a data breach notice informing him that his Private Information provided to ICE was compromised during the Data Breach.

---

[6] *See*, the Notice.

14.     Plaintiff Justin Rivera is an adult, who at all relevant times, was a resident and citizen of the State of New York. Plaintiff received a data breach notice informing him that his Private Information provided to ICE was compromised during the Data Breach

15.     Plaintiffs have suffered actual injury from having their Private Information exposed and/or stolen as a result of the Data Breach, including: (a) required mitigation efforts, including researching the Data Breach and needing to monitor their financial statements to ensure their information is not used for identity theft and fraud; (b) damages to and diminution of the value of their Private Information, a form of intangible property that loses value when it falls into the hands of criminals; (c) loss of privacy; and (d) continuous imminent and impending injury raising from increased risk of financial identity theft and fraud.

16.     As a direct and proximate result of the Data Breach, Plaintiffs have also received a significant increase in spam calls since the Data Breach. Plaintiffs noticed that this was a considerable increase from the amount of spam calls they received before the Data Breach.

17.     As a result of the Data Breach, Plaintiffs will continue to be at a substantial and certainly impending risk for fraud and identity theft, and their attendant damages, for years to come.

18.     Defendant The Institute of Culinary Education, Inc. is a New York domestic business corporation authorized to do business in New York State with its principal place of business located at 225 Liberty Street, New York, NY 10281.

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000.00, exclusive of interest and costs, there are 100 or more members of

the proposed class, and at least one member of the proposed class is a citizen of a state different than Defendant.

20.    This Court has personal jurisdiction over Defendant because a substantial part of the events, omissions, and acts giving rise to the claims herein occurred in this District and Defendant resides in this District.

21.    Pursuant to 28 U.S.C. § 1391, this Court is the proper venue for this action because a substantial part of the events, omissions, and acts giving rise to the claims herein occurred in this District and Defendant resides in this District.

## FACTUAL BACKGROUND

22.    Defendant ICE is a respected culinary school based in New York City, offering professional training for chefs, bakers, and hospitality professionals.

23.    Plaintiffs and Class Members are and/or were students or employees of Defendant.

24.    As a condition of obtaining Defendant's services or employment, Plaintiffs and Class Members directly or indirectly entrusted ICE with their sensitive Private Information.

25.    Plaintiffs and Class Members value the confidentiality of their Private Information and, accordingly, have taken reasonable steps to maintain the confidentiality of their Private Information.

26.    In turning over their Private Information, Plaintiffs and Class Members reasonably expected that Defendant would safeguard their highly sensitive information.

27.    By obtaining, collecting, and storing Plaintiffs' and Class Members' Private Information, ICE assumed equitable and legal duties to safeguard Plaintiffs' and Class Members' highly sensitive information, to only use this information for business purposes, and to only make authorized disclosures.

28.    Despite these duties, ICE failed to implement reasonable data security measures to protect Plaintiffs' and Class Members' Private Information and ultimately allowed threat actors to breach its computer systems and exfiltrate Plaintiffs' and Class Members' Private Information.

**THE VALUE OF PRIVATE INFORMATION AND EFFECTS OF UNAUTHORIZED DISCLOSURE**

29.    ICE understood that the Private Information it collects was highly sensitive and of significant value to those who would use it for wrongful purposes.

30.    ICE also knew that a breach of its computer systems, and exposure of the Private Information stored therein, would result in the increased risk of identity theft and fraud against the individuals whose Private Information was compromised.

31.    These risks are not theoretical; in recent years, numerous high-profile breaches have occurred at business such as Equifax, Facebook, Yahoo, Marriott, Anthem, and many others.

32.    Private Information has considerable value and constitutes an enticing and well-known target to hackers. Hackers can easily sell stolen data as there has been "proliferation of open and anonymous cybercrime forums on the Dark Web that serve as a bustling marketplace for such commerce."[7]

33.    As the FTC recognizes, identity thieves can use this information to commit an array of crimes including identity theft, and medical and financial fraud.[8]

34.    The prevalence of data breaches and identity theft has increased dramatically in recent years, accompanied by a parallel and growing economic drain on individuals, businesses, and government entities in the U.S. In 2021, there were 4,145 publicly disclosed data breaches,

---

[7]    Brian Krebs, *The Value of a Hacked Company*, Krebs on Security (July 14, 2016), http://krebsonsecurity.com/2016/07/the-value-of-a-hacked-company/.
[8]    *What To Know About Identity Theft*, FTC Consumer Advice (Sept. 2024), https://www.consumer.ftc.gov/articles/0271-warning-signs-identity-theft.

exposing 22 billion records. The United States specifically saw a 10% increase in the total number of data breaches.[9]

35.    Indeed, a 2022 poll of security executives predicted an increase in attacks over the next two years from "social engineering and ransomware" as nation-states and cybercriminals grow more sophisticated. Unfortunately, these preventable causes will largely come from "misconfigurations, human error, poor maintenance, and unknown assets."[10]

36.    In tandem with the increase in data breaches, the rate of identity theft complaints has also increased over the past few years. For instance, in 2017, 2.9 million people reported some form of identity fraud compared to 5.7 million people in 2021.[11]

37.    The ramifications of ICE 's failure to keep Plaintiffs' and Class Members' Private Information secure are long-lasting and severe. Once Private Information is stolen, fraudulent use of that information and damage to victims may continue for years. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches: "[I]n some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data has been sold or posted on the [Dark] Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm."[12]

---

[9]  *Data Breach Report: 2021 Year End*, Risk Based Security (Feb. 4, 2022), https://www.riskbasedsecurity.com/2022/02/04/data-breach-report-2021-year-end/.

[10] Chuck Brooks, *Alarming Cyber Statistics For Mid-Year 2022 That You Need to Know*, Forbes (June 3, 2022), https://www.forbes.com/sites/chuckbrooks/2022/06/03/alarming-cyber-statistics-for-mid-year-2022-that-you-need-to-know/?sh=176bb6887864.

[11] *Facts + Statistics: Identity theft and cybercrime*, Insurance Information Institute, https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime#Identity%20 Theft%20And%20Fraud%20Reports,%202015-2019%20 (last accessed October 14, 2025).

[12] *Report to Congressional Requesters, Personal Information, June 2007*, U.S. Gov't Accountability Office, https://www.gao.gov/new.items/d07737.pdf (last visited October 14, 2025).

38.     Even if stolen Private Information does not include financial or payment card account information, that does not mean there has been no harm, or that the breach does not cause a substantial risk of identity theft. Freshly stolen information can be used with success against victims in specifically targeted efforts to commit identity theft known as social engineering or spear phishing. In these forms of attack, the criminal uses the previously obtained PII about the individual, such as name, address, email address, and affiliations, to gain trust and increase the likelihood that a victim will be deceived into providing the criminal with additional information.

39.     The specific types of personal data compromised in the Data Breach makes the information particularly valuable to thieves and leaves Plaintiffs and other Class Members especially vulnerable to identity theft, tax fraud, medical fraud, credit and bank fraud, and more.

40.     **Social Security Numbers**—Unlike credit or debit card numbers in a payment card data breach—which can quickly be frozen and reissued in the aftermath of a breach—unique Social Security Numbers cannot be easily replaced. Even when such numbers are replaced, the process of doing so results in a major inconvenience to the subject person, requiring a wholesale review of the person's relationships with government agencies and any number of private companies in order to update the person's accounts with those entities.

41.     Indeed, the Social Security Administration warns that the process of replacing a Social Security is a difficult one that creates other types of problems, and that it will not be a complete remedy for the affected person:

> Keep in mind that a new number probably will not solve all your problems. This is because other governmental agencies (such as the IRS and state motor vehicle agencies) and private businesses (such as banks and credit reporting companies) likely will have records under your old number. Along with other personal information, credit reporting companies use the number to identify your credit record. So using a new number will not guarantee you a fresh start.

> This is especially true if your other personal information, such as your name and address, remains the same.
>
> If you receive a new Social Security Number, you should not be able to use the old number anymore.
>
> For some victims of identity theft, a new number actually creates new problems. If the old credit information is not associated with your new number, the absence of any credit history under the new number may make more difficult for you to get credit.[13]

42.     Social Security Numbers allow individuals to apply for credit cards, student loans, mortgages, and other lines of credit—among other services. Often social security numbers can be used to obtain medical goods or services, including prescriptions. They are also used to apply for a host of government benefits. Access to such a wide range of assets makes social security numbers a prime target for cybercriminals and a particularly attractive form of PII to steal and then sell.

43.     Moreover, "[u]nlike credit card data or personal Social Security numbers, there are few mechanisms in place to alert consumers that their passport numbers have been stolen and possibly used for fraud" making it difficult to determine if criminals are using a forged or fraudulent passport in an individual's name.[14]

44.     Based on the value to cybercriminals of the customer PII in its possession, ICE knew or should have known the importance of safeguarding the PII entrusted to it and of the foreseeable consequences if its data security systems were breached. ICE failed, however, to take adequate cyber security measures to prevent the Data Breach from occurring.

**ICE Breached its Duty to Protect Private Information**

45.     On or about August 26, 2025, ICE became aware of a cybersecurity event.

---

[13] *Identify Theft and Your Social Security Numbers*, Social Security Admin. (June 2021), https://www.ssa.gov/pubs/EN-05-10064.pdf.
[14] Kate Fazzini, *Here's how criminals use stolen passport information*, CNBC (July 5, 2019), https://www.cnbc.com/2019/07/05/how-criminals-use-stolen-passport-information.html.

46.     After becoming aware of the Data Breach, ICE promptly launched an investigation into the breach.[15]

47.     According to recent news reports, the ransomware group Payouts King took credit for the attack in late June, saying it stole 1.5 TB of data during the Data Breach. ICE is on its data leak site with the status, "leaked."[16]

48.     The information compromised during the Data Breach includes, at the very least, personal information provided to ICE including names, Social Security numbers, dates of birth, driver's license numbers and US alien registration numbers.[17]

49.     Despite the fact that Payouts King were promoting the fact they accessed ICE's systems in June, Defendant claims it did not become aware of the event until August 26.

50.     Defendant has not stated whether they were ever contacted by Payouts King seeking payment for the stolen information.

51.     On or around October 7, 2025, ICE reported the Data Breach to the Office of the Maine Attorney General and other states' Attorneys General, indicating the Data Breach compromised the Private Information of 33,342 individuals.[18]

52.     As set forth below, despite this threat, and other known threats, upon information and belief, ICE failed to take any action to increase security of the Private Information it held and knew to be highly valuable to cybercriminals.

---

[15] *See,* the Notice.
[16] Paul Bischoff, *Institute of Culinary Education notifies 33,000+ people of data breach that leaked SSNs*, Comparitech (Oct. 8, 2025) https://www.comparitech.com/news/institute-culinary-education-notifies-33000-people-of-data-breach-that-leaked-ssns/.
[17] *Id.*
[18] *Data Breach Notifications*, n. 2.

53.     Around the time ICE notified Maine's Attorney General of the Data Breach, Plaintiffs received a notice informing them that their Private Information had been compromised during the Data Breach.

54.     Upon information and belief, Class Members received similar notices informing them that their Private Information was compromised during the Data Breach.

55.     The Data Breach occurred as a direct result of ICE's failure to implement and follow basic security procedures to protect the Private Information that it had collected and stored.

**ICE FAILED TO COMPLY WITH FTC GUIDELINES**

56.     ICE is prohibited by the Federal Trade Commission Act, 15 U.S.C. § 45 ("FTC Act") from engaging in "unfair or deceptive acts or practices in or affecting commerce." The Federal Trade Commission ("FTC") has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act.

57.     The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[19]

58.     Among other guidance, the FTC recommends the following cybersecurity guidelines for businesses in order to protect sensitive information in their systems:[20]

     a.     Identify all connections to the computers where sensitive information is stored;

---

[19] *Start with Security – A Guide for Business*, United States Federal Trade Comm'n (2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf.
[20] *Protecting Personal Information: A Guide for Business*, United States Federal Trade Comm'n, https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last accessed October 14, 2025).

b.    Assess the vulnerability of each connection to commonly known or reasonably foreseeable attacks;

c.    Do not store sensitive consumer data on any computer with an internet connection unless it is essential for conducting their business;

d.    Scan computers on their network to identify and profile the operating system and open network services. If services are not needed, they should be disabled to prevent hacks or other potential security problems. For example, if email service or an internet connection is not necessary on a certain computer, a business should consider closing the ports to those services on that computer to prevent unauthorized access to that machine;

e.    Pay particular attention to the security of their web applications—the software used to give information to visitors to their websites and to retrieve information from them. Web applications may be particularly vulnerable to a variety of hack attacks;

f.    Use a firewall to protect their computers from hacker attacks while it is connected to a network, especially the internet;

g.    Determine whether a border firewall should be installed where the business's network connects to the internet. A border firewall separates the network from the internet and may prevent an attacker from gaining access to a computer on the network where sensitive information is stored. Set access controls—settings that determine which devices and traffic get through the firewall—to allow only trusted devices with a legitimate business need to access the network. Since the protection a firewall provides is only as effective as its access controls, they should be reviewed periodically;

h.    Monitor incoming traffic for signs that someone is trying to hack in. Keep an eye out for activity from new users, multiple log-in attempts from unknown users or computers, and higher-than-average traffic at unusual times of the day; and

i.    Monitor outgoing traffic for signs of a data breach. Watch for unexpectedly large amounts of data being transmitted from their system to an unknown user. If large amounts of information are being transmitted from a business's network, the transmission should be investigated to make sure it is authorized.

59.    The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to private data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity

on the network; and verify that third-party service providers have implemented reasonable security measures.[21]

60.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

61.    ICE failed to properly implement basic data security practices. ICE's failure to employ reasonable and appropriate measures to protect against unauthorized access to its students' and employees' PII constitutes an unfair act of practice prohibited by Section 5 of the FTC Act.

62.    ICE was at all times fully aware of its obligations to protect the PII of its students and employees given the reams of PII that it had access. ICE was also aware of the significant repercussions that would result from a failure to properly secure the Private Information it maintained.

**ICE FAILURE TO PREVENT, IDENTIFY, AND TIMELY REPORT THE DATA BREACH**

63.    ICE admits that an unauthorized third-party accessed its information technology system.

64.    ICE failed to take necessary precautions or employ adequate measures necessary to protect its computer systems against unauthorized access and keep Plaintiffs' and Class Members' Private Information secure.

---

[21] *Id.*

65.    The Private Information that ICE allowed to be exposed in the Data Breach is the type of private information that ICE knew or should have known would be the target of cyberattacks.

66.    Despite its own knowledge of the inherent risks of cyberattacks, and notwithstanding the FTC's data security principles and practices,[22] ICE failed to disclose that its systems and security practices were inadequate to reasonably safeguard individuals' Private Information.

67.    The FTC directs businesses to use an intrusion detection system to expose a breach as soon as it occurs, monitor activity for attempted hacks, and have an immediate response plan if a breach occurs.[23] Immediate notification to individuals impacted by a data breach is critical so that those impacted can take measures to protect themselves.

**PLAINTIFFS AND CLASS MEMBERS SUFFERED DAMAGES**

68.    The ramifications of ICE's failure to keep Private Information secure are long-lasting and severe. Once Private Information is stolen, fraudulent use of that information and damage to victims may continue for years.

69.    Once Private Information is exposed, there is virtually no way to ensure that the exposed information has been fully recovered or obtained against future misuse. For this reason, Plaintiffs and Class Members will need to maintain these heightened measures for years, and possibly their entire lives as a result of Defendant's conduct. Further, the value of Plaintiffs' and Class Members' Private Information has been diminished by its exposure in the Data Breach.

---

[22] *Protecting Personal Information: A Guide for Business*, Fed. Trade Comm'n (Oct. 2016), https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business.
[23] *Id.*

70.     PII remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, personal information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[24] "Fullz" packages, which includes "extra information about the legitimate credit card owner in case" the scammer's "bona fides are challenged when they attempt to use the credit card" are also offered on the dark web.[25]

71.     Plaintiffs and Class Members are at substantial increased risk of suffering identity theft and fraud or misuse of their Private Information as a result of the Data Breach. From a recent study, 28% of individuals affected by a data breach become victims of identity fraud—this is a significant increase from a 2012 study that found only 9.5% of those affected by a breach would be subject to identity fraud. Without a data breach, the likelihood of identify fraud is only about 3%.[26]

72.     Further, Plaintiffs and Class Members have incurred and will incur out of pocket costs for protective measures, such as identity theft protection, credit monitoring, credit report fees, credit freeze fees, and similar costs related to the Data Breach.

73.     Besides the monetary damage sustained in the event of identity theft, consumers may have to spend hours trying to resolve identity theft issues. For example, the FTC estimates

---

[24] *Stolen PII & Ramifications: Identity Theft and Fraud on the Dark Web*, Armor (Apr. 3, 2018), https://res.armor.com/resources/blog/stolen-pii-ramifications-identity-theft-fraud-dark-web/.
[25] *Id*.
[26]     Stu Sjouwerman, *28 Percent of Data Breaches Lead to Fraud*, KnowBe4, https://blog.knowbe4.com/bid/252486/28-percent-of-data-breaches-lead-to-fraud (last accessed October 14, 2025).

that it takes consumers an average of 200 hours of work over approximately six months to recover from identity theft.[27]

74.     Plaintiffs and Class Members are also at a continued risk because their information remains in ICE's systems, which the Data Breach showed are susceptible to compromise and attack and are subject to further attack so long as ICE fails to take necessary and appropriate security and training measures to protect the Private Information in its possession.

75.     Plaintiffs and Class Members have suffered emotional distress as a result of the Data Breach, the increased risk of identity theft and financial fraud, and the unauthorized exposure of their Private Information to strangers.

76.     As a result of ICE's failure to prevent the Data Breach, Plaintiffs and Class Members have suffered and will continue to suffer injuries, including out of pocket expenses; loss of time and productivity through efforts to ameliorate, mitigate, and deal with the future consequences of the Data Breach; theft of their valuable Private Information; the imminent and certainly impeding injury flowing from fraud and identity theft posed by their Private Information being disclosed to unauthorized recipients and cybercriminals; damages to and diminution in value of their Private Information; and continued risk to Plaintiffs' and the Class Members' Private Information, which remains in the possession of Defendant and which is subject to further breaches so long as ICE fails to undertake appropriate and adequate measures to protect the Private Information entrusted to it.

---

[27] Kathryn Parkman, *How to Report identity Theft*, ConsumerAffairs (Feb. 17, 2022), https://www.consumeraffairs.com/finance/how-to-report-identity-theft.html.

## CLASS ALLEGATIONS

77.    Plaintiffs bring this class action on behalf of themselves and all other individuals who are similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure.

78.    Plaintiffs seek to represent a class of persons to be defined as follows:

> All individuals in the United States whose Private Information was compromised in the Data Breach (the "Class").

79.    Excluded from the Class are ICE, its subsidiaries and affiliates, officers and directors, any entity in which Defendant has a controlling interest, the legal representative, heirs, successors, or assigns of any such excluded party, the judicial officer(s) to whom this action is assigned, and the members of their immediate families.

80.    This proposed class definition is based on the information available to Plaintiffs at this time. Plaintiffs may modify the class definition in an amended pleading or when they move for class certification, as necessary to account for any newly learned or changed facts as the situation develops and discovery gets underway.

81.    **Numerosity:** Plaintiffs are informed and believe, and thereon alleges, that there are at minimum, tens of thousands of members of the Class described above. The exact size of the Class and the identities of the individual members are identifiable through Defendant's records, including but not limited to the files implicated in the Data Breach.

82.    **Commonality:** This action involved questions of law and fact common to the Class. Such common questions include but are not limited to:

    a.    Whether Defendant had a duty to protect the Private Information of Plaintiffs and Class Members;

    b.    Whether Defendant was negligent in collecting and storing Plaintiffs' and Class Members' Private Information, and breached its duties thereby;

17

      c.     Whether Plaintiffs and Class Members are entitled to damages as a result of Defendant's wrongful conduct; and

      d.     Whether Plaintiffs and Class Members are entitled to restitution as a result of Defendant's wrongful conduct.

83.    **Typicality:** Plaintiffs' claims are typical of the claims of the members of the Class. The claims of Plaintiffs and members of the Class are based on the same legal theories and arise from the same unlawful and willful conduct. Plaintiffs and members of the Class each had their Private Information exposed and/or accessed by an unauthorized third-party.

84.    **Adequacy of Representation:** Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the members of the Class. Plaintiffs will fairly, adequately, and vigorously represent and protect the interests of the members of the Class and have no interests antagonistic to the members of the Class. In addition, Plaintiffs have retained counsel who are competent and experienced in the prosecution of class action litigation. The claims of Plaintiffs and the Class Members are substantially identical as explained above.

85.    **Superiority:** This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class is impracticable. This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense, and promote uniform decision-making.

86.    **Predominance:** Common questions of law and fact predominate over any questions affecting only individual Class Members. Similar or identical violations, business

practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action. For example, Defendant's liability and the fact of damages is common to Plaintiffs and each member of the Class. If Defendant breached its duty to Plaintiffs and Class Members, then Plaintiffs and each Class member suffered damages by that conduct.

87.     **Injunctive Relief:** Defendant has acted and/or refused to act on grounds that apply generally to the Class, making injunctive and/or declaratory relief appropriate with respect to the Class under Fed. R. Civ. P. 23(b)(2).

88.     **Ascertainability:** Members of the Class are ascertainable. Class membership is defined using objective criteria, and Class Members may be readily identified through Defendant's books and records.

**CLAIMS FOR RELIEF**

**COUNT I**
**NEGLIGENCE**
**(On Behalf of Plaintiffs and the Class)**

89.     Plaintiffs re-allege the above allegations as if fully set forth herein.

90.     Plaintiffs and Class Members provided their non-public Private Information to Defendant as a condition of employment or seeking enrollment with Defendant.

91.     Defendant owed a duty to Plaintiffs and Class Members to exercise reasonable care in securing, safeguarding, storing, and protecting the PII it collected from them from being compromised, lost, stolen, accessed and misused by unauthorized parties. This duty includes, among other things, designing, maintaining, overseeing, and testing Defendant's security systems to ensure that PII in ICE's possession was adequately secured and protected.

92.     Defendant had full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiffs and Class Members could and would suffer if their Private Information were wrongfully disclosed.

93.     Defendant owed a duty of care to Plaintiffs and Class Members to provide reasonable security, consistent with industry standards, to ensure that its systems and networks adequately protected their Private Information.

94.     Defendant had a special relationship with Plaintiffs and Class Members. Plaintiffs' and Class Members' willingness to entrust ICE with their Private Information was predicated on the understanding that ICE would take adequate security precautions to protect their PII.

95.     By assuming the responsibility to collect and store this data, Defendant had duties of care to use reasonable means to secure and to prevent disclosure of the information, and to safeguard the information from theft.

96.     Plaintiffs and members of the Class entrusted Defendant with their PII with the understanding that ICE would safeguard their information.

97.     Defendant's conduct also created a foreseeable risk of harm to Plaintiffs and Class Members by failing to: (i) secure its systems and exercise adequate oversight of its data security protocols; (ii) ensure compliance with industry standard data security practices, (iii) implement adequate system and event monitoring, and (iv) implement the systems, policies, and procedures necessary to prevent the Data Breach.

98.     Defendant knew, or should have known, of the risks inherent in collecting and storing PII, the vulnerabilities of its systems, and the importance of adequate security. Defendant should have been aware of numerous, well-publicized data breaches in the months and years preceding the Data Breach.

99.     Defendant breached its common law duty to act with reasonable care in collecting and storing the Private Information of its students and employees, which exists independently from any contractual obligations between the parties. Specifically, Defendant breached its common law, statutory, and other duties to Plaintiffs and Class Members in numerous ways, including by:

    a.    failing to adopt reasonable data security measures, practices, and protocols;

    b.    failing to implement data security systems, practices, and protocols sufficient to protect Plaintiffs' and Class Members' PII;

    c.    storing former students' PII longer than reasonably necessary;

    d.    failing to comply with industry-standard data security measures; and

    e.    failing to timely disclose critical information regarding the nature of the Data Breach.

100.    Defendant's failure to implement and maintain adequate data security measures to protect Plaintiffs' and Class Members' Private Information created conditions conducive to a foreseeable, intentional criminal act in the form of the Data Breach. Plaintiffs and Class Members did not contribute to the Data Breach or the subsequent misuse of their Private Information.

101.    Defendant owed a duty of care to Plaintiffs and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that their systems and networks, and the personnel responsible for them, adequately protected the Private Information.

102.    Moreover, Defendant had a duty to promptly and adequately notify Plaintiffs and Class Members of the Data Breach.

103.    Despite having that duty, Defendant waited to inform Plaintiffs and Class Members their Private Information had been breached.

104.    Defendant had and continues to have duties to adequately disclose that the Private Information of Plaintiffs and Class Members within Defendant's possession might have been compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice is necessary to allow Plaintiffs and Class Members to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their Private Information by third parties.

105.    Defendant's conduct was particularly unreasonable given the nature and amount of Private Information it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiffs and Class Members.

106.    Defendant has admitted that the Private Information of Plaintiffs and Class Members was wrongfully disclosed to unauthorized third persons as a result of the Data Breach.

107.    Defendant's conduct was particularly unreasonable given the nature and amount of Private Information it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiffs and Class Members.

108.    But for Defendant's wrongful and negligent breaches of duties owed to Plaintiffs and Class Members, the Private Information of Plaintiffs and Class Members would not have been compromised.

109.    As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have and will suffer damages including, but not limited to: (i) the loss of value of their Private Information and loss of opportunity to determine for themselves how their PII is used; (ii) the publication and/or theft of their PII; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII; (iv) lost opportunity costs associated with addressing and attempting to mitigate the actual and future

consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest and recover from tax fraud and identity theft; (v) time, effort, and expense associated with placing fraud alerts or freezes on credit reports; (vi) anxiety, emotional distress, loss of privacy, and other economic and non-economic losses; (vii) the continued risk to their PII, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as ICE fails to undertake appropriate and adequate measures to protect it; and (viii) future costs in terms of time, effort and money that will be expended to prevent, detect, contest, and repair the inevitable and continuing consequences of compromised for the rest of their lives.

110.    Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by entities such as Defendant or failing to use reasonable measures to protect PII. Various FTC publications and orders also form the basis of Defendant's duty.

111.    Defendant violated Section 5 of the FTC Act by failing to use reasonable measures to protect Plaintiffs' and Class Members' PII and not complying with the industry standards. Defendant's conduct was particularly unreasonable given the nature and amount of PII they obtained and stored and the foreseeable consequences of a data breach involving the PII they obtained.

112.    Plaintiffs and Class Members are within the class of persons that Section 5 of the FTC Act is intended to protect.

113.    Moreover, the harm that has occurred is the type of harm that Section 5 of FTC Act was intended to guard against. Indeed, the FTC has pursued over fifty enforcement actions against businesses which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm suffered by Plaintiffs and Class Members.

114.    Defendant's violation of Section 5 of the FTC Act constitutes negligence *per se*

115.    But for Defendant's wrongful and negligent breaches of duties owed to Plaintiffs and Class Members, the Private Information of Plaintiffs and Class Members would not have been compromised.

116.    There is a close causal connection between Defendant's failure to implement security measures to protect the Private Information of Plaintiffs and Class Members and the harm, or risk of imminent harm, suffered by Plaintiffs and Class Members. The Private Information of Plaintiffs and Class Members was lost and accessed as the proximate result of Defendant's failure to exercise reasonable care in safeguarding such Private Information by adopting, implementing, and maintaining appropriate security measures.

117.    As a direct and proximate result of Defendant's negligence, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) lost or diminished value of Private Information; (iii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (iv) loss of benefit of the bargain; (v) an increase in spam calls, texts, and/or emails; and (vi) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

118.    As a direct and proximate result of Defendant's negligence, Plaintiffs and the Class have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

119.     Additionally, as a direct and proximate result of Defendant's negligence and negligence *per se*, Plaintiffs and the Class have suffered and will suffer the continued risks of exposure of their Private Information, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fail to undertake appropriate and adequate measures to protect the Private Information in its continued possession.

120.     As a direct and proximate result of Defendant's negligence, Plaintiffs and Class Members have been injured as described herein, and are entitled to damages, including compensatory, punitive, and nominal damages, in an amount to be proven at trial.

**COUNT II**
**<u>BREACH OF IMPLIED CONTRACT</u>**
**(On Behalf of Plaintiffs and the Class)**

121.     Plaintiffs re-allege the above allegations as if fully set forth herein.

122.     In connection with their relationship with Defendant, Plaintiffs and Class Members entered into implied contracts with ICE

123.     Plaintiffs and Class Members were required to deliver their Private Information to Defendant as part of the process of obtaining services or employment with Defendant.

124.     Defendant solicited, offered, and invited Class Members to provide their Private Information. Plaintiffs and Class Members accepted Defendant's offers and provided their Private Information to Defendant.

125.     Defendant accepted possession of Plaintiffs' and Class Members' Private Information for the purpose of providing services or employment to Plaintiffs and Class Members.

126.     When Plaintiffs and Class Members provided their PII to ICE, either directly or indirectly, they entered into implied contracts with ICE.

127.    Pursuant to these implied contracts, in exchange for the consideration and PII provided by Plaintiffs and Class Members, Defendant agreed to, among other things, and Plaintiffs and Class Members understood that ICE would: (a) provide employment and/or services to Plaintiffs and Class Members; (b) implement reasonable measures to protect the security and confidentiality of Plaintiffs' and Class Members' PII; and (c) protect Plaintiffs' and Class Members' PII in compliance with federal and state laws and regulations and industry standards.

128.    In entering into such implied contracts, Plaintiffs and Class Members reasonably believed and expected that Defendant's data security practices complied with relevant laws and regulations and were consistent with industry standards.

129.    Implicit in the agreement between Plaintiffs and Class Members and Defendant to provide Private Information, was the latter's obligation to: (a) use such Private Information for business purposes only, (b) take reasonable steps to safeguard that Private Information, (c) prevent unauthorized disclosures of the Private Information, (d) provide Plaintiffs and Class Members with prompt and sufficient notice of any and all unauthorized access and/or theft of their Private Information, (e) reasonably safeguard and protect the Private Information of Plaintiffs and Class Members from unauthorized disclosure or uses, and (f) retain the Private Information only under conditions that kept such information secure and confidential.

130.    The protection of PII was a material term of the implied contracts between Plaintiffs and Class Members, on the one hand, and Defendant, on the other hand. Indeed, as set forth herein, Defendant recognized its duty to provide adequate data security and ensure the privacy of its students' PII with its practice of providing a privacy policy on its website.

131.    Plaintiffs and Class Members performed their obligations under the implied contract when they provided Defendant with their PII.

26

132.    Defendant breached its obligations under its implied contracts with Plaintiffs and Class Members in failing to implement and maintain reasonable security measures to protect and secure their PII, and in failing to implement and maintain security protocols and procedures to protect Plaintiffs' and Class Members' PII in a manner that complies with applicable laws, regulations, and industry standards

133.    The mutual understanding and intent of Plaintiffs and Class Members on the one hand, and Defendant, on the other, is demonstrated by their conduct and course of dealing.

134.    On information and belief, at all relevant times, Defendant promulgated, adopted, and implemented written privacy policies whereby it expressly promised Plaintiffs and Class Members that it would only disclose Private Information under certain circumstances, none of which relate to the Data Breach.

135.    On information and belief, Defendant further promised to comply with industry standards and to make sure that Plaintiffs' and Class Members' Private Information would remain protected.

136.    Plaintiffs and Class Members would not have entrusted their Private Information to Defendant in the absence of the implied contract between them and Defendant to keep their information reasonably secure.

137.    Plaintiffs and Class Members would not have entrusted their Private Information to Defendant in the absence of their implied promise to monitor their computer systems and networks to ensure that it adopted reasonable data security measures.

138.    Importantly, New York law provides that every contract includes good faith and fair dealing between the parties involved.

139.    Plaintiffs and Class Members fully and adequately performed their obligations under the implied contracts with Defendant.

140.    Defendant breached the implied contracts it made with Plaintiffs and the Class by failing to safeguard and protect their Private Information, by failing to delete the information of Plaintiffs and the Class once the relationship ended, and by failing to provide accurate notice to them that Private Information was compromised as a result of the Data Breach.

141.    Defendant breached the implied covenant of good faith and fair dealing by failing to maintain adequate computer systems and data security practices to safeguard Private Information, failing to timely and accurately disclose the Data Breach to Plaintiffs and Class Members and continued acceptance of Private Information and storage of other personal information after Defendant knew, or should have known, of the security vulnerabilities of the systems that were exploited in the Data Breach.

142.    Defendant's breach of its obligations of its implied contracts with Plaintiffs and Class Members directly resulted in the Data Breach and the injuries that Plaintiffs and Class Members have suffered from the Data Breach.

143.    Plaintiffs and Class Member suffered by virtue of Defendant's breach of their implied contracts because: (i) they paid for data security protection they did not receive; (ii) they face a substantially increased risk of identity theft - risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (iii) their PII was improperly disclosed to unauthorized individuals; (iv) the confidentiality of their PII has been breached; (v) they were deprived of the value of their PII, for which there is a well-established national and international market; (vi) they have lost time and incurred expenses, and will incur future costs to mitigate and remediate the effects of the Data Breach, including the increased risks of identity theft

they face and will continue to face; and (vii) they have overpaid for the services they received without adequate data security.

144.     Plaintiffs and Class Members are entitled to compensatory, consequential, and nominal damages suffered as a result of the Data Breach.

145.     Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendant to, *e.g.*, (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class Members.

### COUNT III
### UNJUST ENRICHMENT
### (On Behalf of Plaintiffs and the Class)

146.     Plaintiffs re-allege the above allegations as if fully set forth herein.

147.     This count is plead in the alternative to the breach of implied contract count above.

148.     By its wrongful acts and omissions described herein, Defendant has obtained a benefit by unduly taking advantage of Plaintiffs and Class Members.

149.     Plaintiffs and Class Members conferred a benefit on Defendant, whereby they provided their Private Information to Defendant to obtain services.

150.     Defendant prior to and at the time Plaintiffs and Class Members entrusted it with their PII, caused Plaintiffs and Class Members to reasonably believe that it would keep that Private Information secure.

151.     The monies Defendant was paid in its ordinary course of business included a premium for Defendant's cybersecurity obligations and were supposed to be used by Defendant, in part, to pay for the administrative and other costs of providing reasonable data security and protection for Plaintiffs' and Class Members' Private Information.

152.    Defendant knew that Plaintiffs and Class Members conferred a benefit upon it and accepted and retained that benefit by accepting and retaining the Private Information entrusted to it. Defendant profited from Plaintiffs' retained data and used Plaintiffs' and Class Members' Private Information for business purposes.

153.    Defendant failed to disclose facts pertaining to its substandard information systems, or defects and vulnerabilities therein before Plaintiffs and Class Members made their decisions to provide Defendant with their Private Information.

154.    Defendant enriched itself by hoarding the costs it reasonably should have expended on data security measures to secure Plaintiffs' and Class Members' Private Information. Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendant calculated to increase its own profit at the expense of Plaintiffs and Class Members by utilizing cheap, ineffective security measures and diverting those funds to its own personal use. Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the requisite security and the safety of their Private Information.

155.    Defendant failed to provide reasonable security, safeguards, and protections to the Private Information of Plaintiffs and Class Members, and, as a result, Defendant was overpaid.

156.    Under principles of equity and good conscience, Defendant should not be permitted to retain any of the benefits that Plaintiffs and Class Members conferred upon it.

157.    Plaintiffs and Class Members have no adequate remedy at law.

158.    As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) lost or diminished value of Private Information; (iii) lost time and opportunity costs associated

with attempting to mitigate the actual consequences of the Data Breach; (iv) loss of benefit of the bargain; (v) an increase in spam calls, texts, and/or emails; and (vi) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

159.    Plaintiffs and Class Members are entitled to full refunds, restitution, and/or damages from Defendant and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Defendant from its wrongful conduct. This can be accomplished by establishing a constructive trust from which Plaintiffs and Class Members may seek restitution or compensation.

**COUNT IV**
**DECLARATORY JUDGMENT**
**(On Behalf of Plaintiffs and the Class)**

160.    Plaintiffs re-allege all preceding allegations above as if fully set forth herein.

161.    Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described in this Complaint.

162.    An actual controversy has arisen in the wake of the Data Breach regarding Plaintiffs' and Class Members' Private Information and whether ICE is currently maintaining data security measures adequate to protect Plaintiffs and Class Members from further data breaches that compromise their PII. Plaintiffs allege that ICE 's data security measures remain inadequate.

Furthermore, Plaintiffs continue to suffer injury as a result of the compromise of their PII and remains at imminent risk that further compromises of their PII will occur in the future.

163.    Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

      a.    ICE owes a legal duty to secure students' Private Information and to timely notify impacted individuals of a data breach under the common law and various state statutes; and

      b.    ICE continues to breach this legal duty by failing to employ reasonable measures to secure Private Information in its possession.

164.    This Court also should issue corresponding prospective injunctive relief requiring ICE to employ adequate security protocols consistent with law and industry standards to protect Private Information in ICE 's data network.

165.    If an injunction is not issued, Plaintiffs will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach at ICE. The risk of another such breach is real, immediate, and substantial. If another breach at ICE occurs, Plaintiffs will not have an adequate remedy at law because many of the resulting injuries are not readily quantified, and they will be forced to bring multiple lawsuits to rectify the same conduct.

166.    The hardship to Plaintiffs if an injunction is not issued exceeds the hardship to ICE if an injunction is issued. Plaintiffs will likely be subjected to substantial identity theft and other damage. On the other hand, the cost to ICE of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and ICE has a pre-existing legal obligation to employ such measures.

167.    Issuance of the requested injunction will not disserve the public interest. In contrast, such an injunction would benefit the public by preventing another data breach at ICE, thus eliminating the additional injuries that would result to Plaintiffs and Class Members whose confidential information would be further compromised.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment as follows:

A.    For an Order certifying this action as a class action, appointing Plaintiffs as class representatives for the Class, and appointing their counsel to represent the Class;

B.    For equitable relief enjoining ICE from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiffs' and Class Members' PII, and from refusing to issue prompt, complete and accurate disclosures to Plaintiffs and Class Members;

C.    For equitable relief compelling ICE to utilize appropriate methods and policies with respect to customer data collection, storage, and safety, and to disclose with specificity the types of PII compromised as a result of the Data Breach;

D.    For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of ICE 's wrongful conduct;

E.    Ordering ICE to pay for not less than ten years of credit monitoring services for Plaintiffs and Class Members;

F.    For an award of actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;

G.    For an award of punitive damages, as allowable by law;

H.    For an award of attorneys' fees and costs, and any other expense, including expert

witness fees;

     I.     Pre- and post-judgment interest on any amounts awarded; and

     J.     Such other and further relief as this court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiffs demand a trial by jury on all claims so triable

Dated: October 14, 2025          Respectfully submitted,

**LYNCH CARPENTER, LLP**

*/s/ Gary F. Lynch*
Gary F. Lynch (NY 5553854)
1133 Penn Ave, 5th Floor
Pittsburgh, PA 15222
T: 412-322-9243
gary@lcllp.com

Gerald D. Wells, III (*pro hac vice* forthcoming)
Robert J. Gray (*pro hac vice* forthcoming)
1760 Market Street
Suite 600
Philadelphia, PA 19103
Office:  267.609.6910
Fax:    267.609.6955
jerry@lcllp.com
rob@lcllp.com

***Attorneys for Plaintiffs and the Proposed Class***